UNITED STATES DISTRICT COURT
DISTRICT OF PUERTO RICO

UNITED STATES OF AMERICA,

Plaintiff,

v.

TOTALENERGIES MARKETING PUERTO RICO CORPORATION,

Defendant.

**COMPLAINT**

Civil No.: 3:22-cv-1454

The United States of America, by authority of the Attorney General of the United States and through the undersigned attorneys, acting at the request of the Regional Administrator of the U.S. Environmental Protection Agency ("EPA"), Region 2, files this complaint and alleges as follows:

1. This is a civil action brought against TotalEnergies Marketing Puerto Rico Corporation, f/k/a Total Petroleum Puerto Rico Corporation, ("Total") regarding the operation of its gasoline storage tanks and truck loading rack vapor recovery unit ("VRU") in Guaynabo, Puerto Rico in violation of the Clean Air Act ("Act"), 42 U.S.C. § 7409, *et seq*., and regulations promulgated under the Act. Total failed to properly maintain the internal floating roofs in its gasoline storage tanks and, as a result, dangerously high concentrations of gasoline vapors accumulated in the internal air space in the tanks, which created a risk of fire and explosion and resulted in air vapor emissions from tank vents. Total also failed to take timely action required by regulation when liquid was observed on top of the internal floating roof in one tank. Finally, Total failed to properly operate its equipment while loading tanker trucks with fuel leading to

excess emissions of gasoline vapors, and failed to comply with related monitoring and recordkeeping requirements.

2. This action seeks injunctive relief and the assessment of civil penalties for Total's violations of the Act and the regulations applicable to its gasoline and petroleum storage facility.

**JURISDICTION AND VENUE**

3. This Court has jurisdiction of the subject matter of this action pursuant to 28 U.S.C. §§ 1331, 1345, and 1355, and Section 113(b) of the Act, 42 U.S.C. § 7413(b), and over the parties.

4. Venue is proper in this District pursuant to Sections 113(b) of the Act, 42 U.S.C. 7413(b), and 28 U.S.C. § 1391(b) and (c), and 1395(a) because the violations occurred and are occurring in this district.

**PARTIES**

5. Plaintiff is the United States of America on behalf of EPA.

6. Defendant Total is organized under the laws of, does business in, and maintains offices in, the Commonwealth of Puerto Rico.

**NOTICES**

7. The United States gave notice of the commencement of this action to the Commonwealth of Puerto Rico as required by Section 113(b) of the Act, 42 U.S.C. § 7413(b).

**STATUTORY AND REGULATORY BACKGROUND**

**The Volatile Organic Liquid Storage Vessels NSPS (Subpart Kb)**

8. Section 111(b)(1)(A) of the Act, 42 U.S.C. § 7411(b)(1)(A), requires EPA to publish a list of categories of stationary sources of air pollution that cause or contribute significantly to air pollution, which may reasonably be anticipated to endanger public health or

welfare. Bulk gasoline storage tanks are one category of such stationary sources. *See* 42 U.S.C. § 7411(a).

9. As required by Sections 111 and 114 of the Act, EPA promulgated regulations applicable to bulk gasoline storage tanks which are referred to as the "Standards of Performance for Volatile Organic Liquid Storage Vessels (Including Petroleum Liquid Storage Vessels) for Which Construction, Reconstruction, or Modification Commenced After July 23, 1984" and which are found at 40 C.F.R. Part 60, Subpart Kb, 40 C.F.R. §§ 60.110b through 60.117b ("NSPS Subpart Kb").

10. NSPS Subpart Kb applies to storage vessels (a) with a capacity of more than 75 cubic meters; (b) that are used to store volatile organic liquids, including gasoline; and (c) that were constructed or modified on or after July 23, 1984. *See* 40 C.F.R. § 60.110b.

11. NSPS Subpart Kb requires that, among other things, owners and operators of affected storage vessels must, if a visual inspection shows that liquid has accumulated on the storage vessel's internal floating roof, repair the roof or empty and remove the storage tank from service within 45 days, or may seek a 30-day extension from the Administrator in certain circumstances. 40 C.F.R. § 60.113b(a)(2).

**The Bulk Gasoline Terminals NSPS (Subpart XX)**

12. As required by Sections 111 and 114 of the Act, EPA promulgated regulations applicable to bulk gasoline terminals which are referred to as the "Standards of Performance for Bulk Gasoline Terminals" and which are found at 40 C.F.R. Part 60, Subpart XX, 40 C.F.R. §§ 60.500 through 60.506 ("NSPS Subpart XX").

13. NSPS Subpart XX applies to the total of all the loading racks at a bulk gasoline terminal which deliver liquid product into gasoline tank trucks, for which the construction or modification of the facility commenced after December 17, 1980. 40 C.F.R. § 60.500.

14. NSPS Subpart XX requires that each affected facility be equipped with a vapor collection system designed to collect the total organic compounds vapors displaced from tank trucks during product loading. 40 C.F.R. § 60.502(a).

15. NSPS Subpart XX requires that, for a vapor collection system that was not constructed or refurbished before Dec. 17, 1980, the emissions to the atmosphere from the vapor collection system due to the loading of liquid product into gasoline tank trucks are not to exceed 35 milligrams (mg) of total organic compounds per liter of gasoline loaded. 40 C.F.R. § 60.502(b).

16. On April 13, 2016, the Puerto Rico Environmental Quality Board issued to Total Petroleum Puerto Rico Corp. an operating permit for the Guaynabo Facility. Paragraph 58 of the operating permit requires that, in compliance with 40 C.F.R. § 60.502(b), the emissions to the atmosphere from the VRU occurring while liquid product is loaded into trucks cannot exceed 35 mg of VOC per liter of gasoline loaded.

17. To meet the 35 mg per liter requirement of NSPS Subpart XX, Total established an operating parameter value of 2.74% by volume as propane averaged on a six-hour basis, based on emission testing data. This measurement is to be taken by the CEMS at the exhaust airstream of the VRU.

**The Bulk Gasoline Distribution Terminal NESHAP (MACT Subpart 6B)**

18. Section 112(b)(1) of the Act, 42 U.S.C. § 7412(b)(1), sets forth a list of hazardous air pollutants ("HAPs").

19. Section 112(c) of the Act, 42 U.S.C. § 7412(c), requires EPA to publish a list of categories and subcategories of major and area sources of the HAPs listed in Section 112(b)(1) of the Act.

20. Section 112(d) of the Act, 42 U.S.C. § 7412(d), requires EPA to promulgate emission standards for each category or subcategory of major and area sources of listed HAPs. These emissions standards are called National Emissions Standards for Hazardous Air Pollutants ("NESHAP"), and are found at 40 C.F.R. Part 63.

21. Section 112(b) lists a number of HAPs that are commonly emitted from gasoline distribution bulk terminals.

22. On January 10, 2008, EPA, under the authority of Sections 112 and 114 of the Act, promulgated regulations applicable to gasoline distribution bulk terminals. These regulations are referred to as the "National Emission Standards for Hazardous Air Pollutants: Gasoline Distribution Bulk Terminals, Bulk Plants, and Pipeline Facilities." They are codified at 40 C.F.R. Part 63, Subpart BBBBBB, §§ 63.11080 to 63.11100 ("MACT Subpart 6B").

23. Existing affected sources subject to MACT Subpart 6B were required to comply with the Subpart by January 10, 2011. 40 C.F.R. § 63.11083(b).

***Loading Rack Vapor Recovery Unit Requirements***

24. MACT Subpart 6B requires that, for facilities such as Total's that have a throughput of at least 250,000 gallons of product per day, the owner or operator must equip the truck loading rack with a vapor recovery system that collects total organic carbon vapors displaced from the tanker trucks during product loading. 40 C.F.R. § 63.11088 and MACT Subpart 6B, Table 2.

25. MACT Subpart 6B requires owners and operators of bulk gasoline terminals subject to the subpart to maintain and operate a continuous monitoring system (CMS) to monitor the performance of the vapor recovery system [and emissions of organic carbon vapors] during tanker truck loading operations. 40 C.F.R. § 63.11092(b). The CMS must satisfy certain performance specifications under 40 C.F.R. § 63.11092(b).

26. MACT Subpart 6B requires owners and operators of bulk gasoline terminals subject to the subpart to ensure that total organic carbon emissions from the truck loading rack do not exceed 80 mg per liter of product loaded into the tanker trucks. 40 C.F.R. § 63.11088, and MACT Subpart 6B, Table 2.

27. MACT Subpart 6B requires owners and operators of bulk gasoline terminals subject to the subpart to maintain readily accessible records, *inter alia*, of the time intervals during which loadings of tanker trucks have occurred or, alternatively, the data generated by the CMS during such loadings. 40 C.F.R. § 63.11094(f)(1).

***General Duty Requirement***

28. On January 24, 2011, EPA added a "general duty" requirement to MACT Subpart 6B, and it became effective that same day. 76 Fed. Reg. 4156 (Jan. 24, 2011).

29. The general duty provision requires each owner or operator of an affected source to "at all times, operate and maintain any affected source, including associated air pollution control equipment and monitoring equipment, in a manner consistent with safety and good air pollution control practices for minimizing emissions." 40 C.F.R. § 63.11085.

**Enforcement Provisions**

30. Under Section 111(e) of the Act, 42 U.S.C. § 7411(e), it is unlawful for any owner or operator of a new source to operate that source in violation of a standard promulgated under Section 111.

31. Under Section 112(i)(3)(A) of the Act, 42 U.S.C. § 7412(i)(3)(A), it is unlawful for any person to operate a source in violation of a standard, limitation or regulation promulgated under Section 112.

32. Under Section 113(b), 42 U.S.C. § 7413(b), EPA may commence a civil action for a permanent or temporary injunction or to assess and recover a civil penalty of up to $25,000 per day for each violation of Sections 111 and 112 of the Act, 42 U.S.C. §§ 7411 and 7412;

33. The maximum daily civil penalty amounts under Section 113(b)(2) of the Act are adjusted up to $109,024 in accordance with the Debt Collection Improvement Act, 31 U.S.C. 3701 et seq. (DCIA), and 40 C.F.R. Part 19, promulgated pursuant to the DCIA.

**GENERAL ALLEGATIONS**

34. Total operates a gasoline storage facility at Road PR-28, Km 0.8, in Guaynabo, Puerto Rico ("Facility").

35. The Facility includes seven above-ground gasoline storage tanks.

36. Total fills these tanks with gasoline and other fuels brought in by barge or ship and distributes these products to tanker trucks using a truck loading rack.

37. The Facility is a "bulk gasoline terminal" as defined under 40 C.F.R. §§ 60.500 and 63.11081.

38. Total is an "owner and operator" as defined under sections 111(a)(5) and 112(a)(9) of the Act, 42 U.S.C. §§ 7411(a)(5) and 7412(a)(9) and under 40 C.F.R. §§ 60.2 and 63.2 of a bulk gasoline terminal.

39. The Facility is subject to NSPS Subpart Kb, NSPS Subpart XX and MACT Subpart 6B.

***Internal Floating Roofs***

40. At the times relevant to this Complaint, each of the storage tanks at the Facility have had an external fixed roof and an internal floating roof.

41. The internal floating roof rises and falls with the level of the liquid inside the tank and either floats directly on the liquid surface or rests on pontoons several inches above the liquid surface.

42. The storage tanks' internal floating roofs function as emission control equipment. When maintained properly, internal floating roofs will minimize: (a) evaporation of vapors from the stored liquid; (b) the accumulation of gasoline vapors in the internal airspace between the internal floating roof and the external fixed roof; and (c) emissions of gasoline vapors from the tanks.

43. As the concentration of gasoline vapors in the storage tanks' internal airspace increases, so does the risk of fire and explosion.

44. An indicator of how well an internal floating roof is being maintained and is working is by comparison of the concentration of gasoline vapors in the internal airspace to the lower explosive limit ("LEL") of the vapors in that space.

45. The LEL is a standard established by the National Fire Protection Association ("NFPA") that relates to enclosed spaces such as the airspace within the internal floating roof tanks at the Facility.

46. The LEL is defined as the lowest concentration (by percentage) of a gas or vapor in air that is capable of producing a flash of fire in the presence of an ignition source (such as an arc, flame, or heat).

47. According to the NFPA, vapor concentrations in internal airspaces such as those in gasoline storage tanks should be maintained below 25% of the LEL in order to provide an adequate margin of fire safety. Maintaining an LEL above 25% indicates a potentially hazardous condition that can lead to a fire or an explosion.

48. Commencing on or before June 8, 2018, the concentrations of gasoline vapors in four of the Facility's storage tanks, Tank Nos. 13, 14, 15, and 19, exceeded 25% of the LEL.

49. Commencing on or before May 8, 2019, the concentrations of gasoline vapors in the Facility's Tank No. 21 exceeded 25% of the LEL.

50. At various times since then, the concentrations of gasoline vapors in some of these tanks were well above 25% of the LEL and occasionally reached 100% of the LEL.

51. The high concentrations of gasoline vapors in the storage tanks' internal airspaces created a risk of fire and explosion.

52. The high concentrations of gasoline vapors in the storage tanks' internal airspaces endangered Total's employees and the surrounding community.

53. As indicated by these high gasoline vapor concentrations, Total failed to properly maintain the internal floating roofs of its storage tanks.

54. Among other failures, Total failed to maintain the seals between the internal floating roofs and the sides of the tanks, and failed to maintain the pressure relief valves in the tanks.

55. Total's failure to properly maintain the internal floating roofs in its tanks created an increased risk of fire and explosion.

56. Total's tanks have perimeter roof vents which allow air and gasoline vapors in the internal airspace to escape to the atmosphere.

57. Total's failure to properly maintain the internal floating roofs in its tanks caused emissions of significant quantities of gasoline vapors and HAPs from the tanks.

58. Total asserts that it emptied all liquid from tank nos. 13, 15, 19, and 21 and cleaned these tanks during the months of May and June 2019.

59. Total asserts that by June 1, 2019 the concentrations of gasoline vapors in Tank No. 14 were consistently below 25% of LEL.

***Tank 31 Internal Floating Roof***

60. On or about October 23, 2019, Total discovered that liquid product had come to be located on top of the internal floating roof of Tank No. 31.

61. Total emptied Tank No. 31 on December 31, 2020, 14 months after discovering product on the top of the internal floating roof. Total did not repair Tank No. 31 before removing it from service.

62. Total also did not timely seek or receive an extension of time to repair Tank No. 31.

***Truck Loading Rack and Vapor Recovery System***

63. The Facility includes a truck loading rack which Total uses to fill tanker trucks with product from the Facility's storage tanks.

64. The truck loading rack has a vapor recovery unit that includes a carbon adsorption system.

65. As tanker trucks are filled with gasoline and other products, organic carbon vapors (such as gasoline vapors) inside the trucks' tanks are displaced.

66. The vapor recovery unit controls organic carbon emissions from tanker truck loading operations; organic carbon vapors displaced from the tanker trucks during product loading are routed via the truck loading rack to the vapor recovery unit.

67. Total installed a CEMS to monitor performance of the vapor recovery unit. However, during the period from June 2016 to May 2018 the CEMS was not capable of measuring concentrations of propane in the exhaust airstream of the VRU higher than 5%. In operation, the CEMS often showed an error reading of "OVER" rather than the actual concentration of propane during times of elevated propane concentration.

68. In order to meet the 35 mg per liter standard required under § 60.502(b) of NSPS Subpart XX and the Facility's operating permit, Total established an average operating parameter value of 2.74% by volume of propane during a six-hour period. The measurement of propane is to be taken at the outlet airstream of the truck loading rack's vapor recovery system. On numerous occasions from June 2016 to May 2018, propane emissions from the truck loading rack's vapor recovery system outlet airstream exceeded 2.74% by volume on a six-hour basis.

69. During each six-hour period when average propane emissions from Total's vapor recovery system exceeded the 2.74% limit, emissions from the truck loading rack also exceeded

the 35 mg per liter standard under NSPS Subpart XX and the Facility's operating permit during the period from November 1, 2018 to November 30, 2019.

70. In reply to EPA's December 3, 2019 request, Total stated that the time interval information was not "readily accessible" and had to be re-created by Total's consultant. Total did not provide this information until January 31, 2020, and when it did so it only provided data for 2019.

**FIRST CLAIM FOR RELIEF**
**Violation of the General Duty Provision**

71. Total failed to comply with MACT Subpart 6B's requirements of 40 C.F.R. § 63.11085 by failing to properly maintain and operate the internal floating roofs on Tank Nos. 13, 14, 15, 19, and 21 in a manner consistent with safety and good air pollution control practices for minimizing emissions.

72. Each failure by Total to comply with MACT Subpart 6B is a violation of Sections 112 and 114 of the Act, 42 U.S.C. §§ 7412, 7414.

73. Pursuant to Sections 113(b) of the Act, 42 U.S.C. §§ 7413(b), the United States is entitled to injunctive relief and civil penalties for Total's violations of the Act.

**SECOND CLAIM FOR RELIEF**
**Failure to Promptly Repair or Take Tank 31 Out of Service**

74. Total failed to comply with the NSPS Subpart Kb requirements of 40 C.F.R. § 60.113b(a)(2) by failing to repair or take Tank No. 31 out of service within 45 days after discovering liquid on the tank's internal floating roof.

75. Each failure by Total to comply with NSPS Subpart Kb is a violation of Sections 111 and 114 of the Act.

76. Pursuant to Sections 113(b) of the Act, 42 U.S.C. §§ 7413(b), the United States is entitled to injunctive relief and civil penalties for Total's violations of the Act.

**THIRD CLAIM FOR RELIEF**
**Failure to Properly Operate Vapor Recovery System**

77. Total failed to comply with MACT Subpart 6B's requirements of 40 C.F.R. § 63.11092(b) by failing to operate a CEMS during tanker truck loading operations that had the capability to measure concentrations of propane at levels regularly present (i.e. above 5%) in the vapor recovery unit's outlet airstream.

78. Total failed to comply with NSPS Subpart XX's requirements of 40 C.F.R. §§ 60.502(b) by failing to ensure that emissions from the truck loading rack did not exceed 35 mg per liter of product loaded into the tanker trucks.

79. Total failed to comply with MACT Subpart 6B's requirements of 40 C.F.R. § 63.11094(f)(1) by failing to maintain readily accessible records of the time intervals during which loadings of tanker trucks have occurred during the period from June 8, 2018 to at least May 2021.

80. Each failure by Total to comply with NSPS Subpart XX and MACT Subpart 6B is a violation of Sections 111, 112 and 114 of the Act, 42 U.S.C. §§ 7411, 7412 and 7414.

81. Pursuant to Sections 113(b) of the Act, 42 U.S.C. §§ 7413(b), the United States is entitled to injunctive relief and civil penalties for Total's violations of the Act.

**PRAYER FOR RELIEF**

Wherefore, the United States respectfully requests that the court grant the following relief:

1. Order Total to comply with all applicable requirements of the Act and its implementing regulations;

2. Assess civil penalties against Total up to the amounts provided in the Act per day for each violation of the Act at the Facility;
3. Award the United States its costs in this action; and
4. Grant the United States such other relief as this Court deems just and proper.

Respectfully submitted,

ELLEN M. MAHAN
Deputy Section Chief
U.S. Department of Justice
Environment and Natural Resources Division
Environmental Enforcement Section

September 19, 2022
Dated

By: MARK GALLAGHER Digitally signed by MARK GALLAGHER Date: 2022.09.19 07:19:59 -04'00'
______________________________

MARK GALLAGHER, Bar No. G03317
Senior Attorney
U.S. Department of Justice
Environment and Natural Resources Division
Environmental Enforcement Division
Washington, D.C. 20044-7611
mark.gallagher@usdoj.gov
202-532-3321

Of Counsel:

SARA FROIKIN
Assistant Regional Counsel
U.S. Environmental Protection
Agency Region 2
290 Broadway
New York, New York 10007